## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT KENDRICKS,** | : | **Civil No.  3:22-CV-1925** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY,** [1] | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The instant case calls upon us to revisit a previously longstanding legal tenet called the treating physician rule, which required ALJs to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. In March of 2017, the Commissioner's regulations governing medical opinions changed; the treating physician rule was eschewed, and the approach to evaluating opinions was changed

---

[1]  Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit.

from a hierarchical form of review to a more holistic analysis considering the consistency and supportability of each of the treating source opinions.

This case is one of those legacy matters, however, which are still governed by the treating physician rule. The plaintiff in his case, Robert Kendricks, protectively filed applications for disability insurance benefits and supplemental security income benefits, pursuant to Titles II and XVI of the Social Security Act on July 30, 2015, prior to this paradigm shift in the way medical opinion evidence is analyzed by the ALJ. Thus, this case requires us to consider:

> A cardinal principle guiding disability, eligibility determinations [] that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time. In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion.

Morder v. Colvin, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24, 2016) (citing Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000); Brownawell v. Commissioner of Social Security, 554 F.3d 352, 355 (3d Cir. 2008) (internal quotations omitted).

So it is here. Kendricks asserted in 2015 that he was disabled due to a number of impairments stemming from a December 2013 slip and fall accident. Throughout

the disability period, Kendricks was being treated for chronic low back and hip pain and consistently sought treatment with specialists including orthopedists, chiropractors, neurologists, and pain management specialists, and treated his pain with medications, physical therapy, nerve blocks and trigger point injections. Nonetheless, he consistently reported difficulty controlling his chronic pain. By 2020, Kendricks' pain management plan included frequent epidural injections, but his pain remained significant, especially in his lower back and left leg, despite attempts at more aggressive treatment. Based on this history, three of Kendricks' treating providers opined that he would be incapable of sustaining consistent work due to off-task time and absenteeism.[2]

In denying Kendricks' disability application, the ALJ gave these three consistent treating source opinions little weight, and seemingly adopted no medical opinion, instead fashioning an RFC based upon his own interpretation of the record. The ALJ reasoned that the treating source opinions were not consistent with the longitudinal treatment records and overall normal objective examination results, including neurological functioning, intact motor strength, sensation, reflexes, and coordination in his extremities. But the ALJ also gave non-examining, impartial

---

[2] A fourth opinion, which was obtained after the ALJ's decision was rendered, further supports the view of his other treating providers.

3

medical expert Dr. Sklaroff's opinion only partial weight, as it failed to consider Kendricks' progressing lower back and lower extremity pain and objective testing following the issuance of his opinion. Thus, it appears that the ALJ relied on his own interpretation of the plaintiff's medical records to conclude that Kendricks was capable of light work.

In this case, we are mindful of the fact that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant," and recognize that "even though an ALJ is not bound to accept the statements of any medical expert, he may not substitute his own judgment for that of a physician." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013). Here, in a case in which the ALJ rejected the great weight of treating source opinion, and crafted an RFC based upon his lay interpretation of the record, with partial weight given to a non-examining, consulting opinion which predated much of the documentation plaintiff's worsening condition, we conclude that the ALJ's burden of articulation has not been met in this appeal. Accordingly, we will remand this case to the Commissioner for further administrative proceedings.

II.    **Statement of Facts and of the Case**

On July 30, 2015, Robert Kendricks applied for a period of disability and disability insurance benefits and supplemental security income alleging that he was totally disabled as of December 7, 2013, due to a number of physical impairments. (Tr. 103). Kendricks was 49 years old at the time of the alleged onset of his disability, classified as a younger individual under the regulations, but, beginning on June 7, 2019, his age category changed to an individual of advanced age. (Tr. 115). He had a limited education and had past work as a cable installer helper. (Id.)

   *1. Kendricks' Longitudinal Medical Records*

With respect to Kendricks' impairments, the record revealed the following:

After a fall on ice in December 2013, Kendricks, reported to his primary care provider who ordered x-rays of his left knee and lumbar spine which showed no evidence of abnormality within the lumbar spine with only minimal degenerative changes and age-indeterminate compression deformity of T11 and no evidence of acute osseous abnormality in the left knee. (Tr. 1471-72).  He was referred to orthopedics for left knee pain. (Tr. 820). He reported issues with stairs but denied swelling or instability. (Id.) An examination revealed normal gait and sensation, normal strength, but tenderness to palpation in the left knee. (Tr. 821). A left knee x-ray revealed no fracture and normal joint space alignment. (Id.) Injection therapy

was noted as a future option and oral steroids were provided and bracing discussed. (Tr. 822). He reported to orthopedic surgery in November 2014 for left hip pain. (Tr. 803). The physical examination revealed tenderness to palpation over the left trochanteric bursa but full strength, negative straight leg raise, and intact sensation. (Id.) He was diagnosed with left greater trochanteric bursitis and corticosteroid injections were administered. (Id.)

He was also being seen by chiropractor Jason Burgess, D.C., beginning in October 2014, reporting neck pain, left sided low back pain and left hip pain. (Tr. 1282-1343). He reported feeling better with the chiropractic treatments, but noted his hip continued to "pop out" and needed to be adjusted, (Tr. 1284), and consistently reported his daily activities being moderately affected by his condition. (Tr. 1282-1343). In 2016 his ADLs were described as "normal," but he reported doing housework aggravated his back pain. (Tr. 1320, 1326, 1330, 1334). He also reported travelling in a car aggravated his back a great deal. (Tr. 1338, 1340, 1342).

Kendricks was also seeing his primary care provider, Kristin O'Donnell, DNP, CRNP, throughout the relevant period, who managed his referrals to orthopedics and neurosurgery. (Tr. 835-62, 1159-71). In November 2014 Kendricks reported occasional neck pain, chronic left hip, mid and left lower back and left knee pain since his 2013 fall but no problems with movement or mobility. (Tr. 1465). Her

6

examination revealed good range of motion in his hands, wrists, elbows, shoulders, spine, hips, knees, and ankles, but tenderness in his lower thoracic and lumbar spine and left SI joint area and noted spasms of the left lumbar and left sacral muscles. (Tr. 1467). He had a stable gait, good muscle bulk and tone and full strength. (Id.)

In August 2014, Kendricks began physical therapy. An initial evaluation and examination stated that he reported a recent increase in pain in his left hip since three weeks prior, limiting his ability to walk, climb stairs, and perform his activities of daily living. (Tr. 1538). He reported back pain in the lumbosacral area exacerbated by bending, walking, or standing for fifteen minutes or more. (Id.) An examination noted poor stabilization throughout the lumbar spine secondary to weakness throughout the core musculature, decreased range of motion and strength in the left hip lower back secondary to pelvic rotation and leg length discrepancy leading to increased pain levels and functional limitations. (Id.) In October 2014 he noted back spasms that morning leading to increased pain and difficulty walking. (Tr. 1543). Decreased range of motion and strength throughout the lumbar spine was again noted. (Id.)

In February 2015 Kendricks visited neurosurgeon Dr. Bryan Bolinger, DO, reporting back pain since his 2013 fall. He stated the pain was mostly on his left side, and rated it a 7 out of 10, aggravated by sitting and laying. (Tr. 798). He also reported

difficulty walking up steps due to weakness and shooting pain in his right knee and numbness/tingling in his back when he sits. (Id.) He stated the left hip bursa injection helped for only a short period of time and his back pain was minimally relieved after seeing a chiropractor, but he had not seen one recently. (Id.) He reported going to physical therapy which helped but denied any recent physical therapy or pain management. (Id.) An examination revealed full strength in his extremities, negative straight leg raise, ability to squat/rise without difficulty, ability to walk on heels and toes without difficulty, but pain in his low back with palpation. (Tr. 800). An MRI was ordered, which revealed mild degeneration and sacroiliac joint dysfunction. (Tr. 797). He was referred to physical therapy and pain management for joint injections. (Id.)

Kendricks was evaluated by Dr. Moin Ud-Din Mallhi at the pain management center on March 26, 2015. He reported pain in his back, buttock, and hip area beginning after his December 2013 fall. (Tr. 2013). He described throbbing, shooting pain average 8/10 severity many times daily along with weakness and numbness with his pain increased with exercising, lifting, stairs, sitting, and even lying down. (Id.) He stated that he was not working due to pain. (Id.) Dr. Mallhi's examination revealed normal sensation and ability to walk on heels and toes but moderate paraspinal muscle spasm in the lumbar spine, marked tenderness in the

sacroiliac joints and moderate tenderness in the gluteal bursa area. (Tr. 2014). Dr. Mallhi noted that he moved about normally but appeared to be in mild to moderate pain. (Tr. 2015). He was assessed with lumbar degenerative disc disease, lumbar spondylosis without myelopathy, facet joint arthropathy, intercostal and ilioinguinal neuralgia, meralgia paresthetica, bursitis around the hip, sacroiliac joint arthropathy, and myofascial pain. (Tr. 2015). Intercostal nerve blocks and trigger point injections were scheduled. (Tr. 2015).

He visited pain management again in April 2015 describing constant sharp, stabbing, and burning pain with a severity of 5 out of 10 that is increased by sitting for long periods and occasional numbness. (Id.) He reported previous treatment of physical therapy (38 sessions), chiropractic manipulation, surgical evaluation, and medications including Baclofen, Naproxen, Ibuprofen, and Tylenol. (Id.) MRI imaging showed mild degeneration and mild disc bulging but were otherwise unremarkable, including no evidence of central spinal stenosis, significant foraminal stenosis or nerve root compressions and no disc herniations. (Tr. 796, 1815). An examination revealed full strength in bilateral lower extremities and intact gait, but tenderness was noted in his back and a SLR produced left hip pain. (Tr. 795-96). Joint injections were administered again in May 2015. (Tr. 788). He reported that the injections provided very little relief. (Tr. 789). His gait was reported as antalgic

9

at an August 2015 pain management follow-up and he reported that his chiropractor told him that his SI join is "out." (Tr. 788). He reported constant 7/10 pain in his left trochanteric area and upper lateral thigh. (Id.) Left sacroiliac joint and left trochanteric bursa injections were administered and more physical therapy was ordered. (Tr. 785). Left SI joint and left trochanteric bursa injections were repeated in November 2015. (Tr. 1683). At that appointment, Kendrick reported pain in his left low back, buttock, hip at a level of 7/10 and reported right leg weakness. (Tr. 1697).

Left SIJ and left trochanteric bursa injections were administered again in March, July, and August of 2016. (Tr. 1065, 1090). He was examined by neurosurgery in June 2016, and it was reported that he ambulates independently without gait dysfunction but that he was unable to ambulate more than approximately one block before needing to stop due to lower back and left hip pain. (Tr. 1245). He was treating his pain with medication, physical therapy, and joint injections, which he reported provided 80% improvement in his pain for one to two weeks following. (Id.) He also reported chiropractic therapy which provided temporary improvement. (Id.) The physical examination revealed tenderness in his back along the left paraspinal regions and in the left SI joint but full strength bilaterally in his extremities and ability to walk on heels and toes independently

without difficulty. (Tr. 1248). His gait was normal. (Id.) He was again referred to pain management for SI joint injections only, excluding the left trochanteric bursa injections. (Tr. 1249). Daily exercise and continued pain medication was also recommended, and it was suggested that SI joint fusion may be discussed in the future. (Id.) At a neurosurgery follow-up in August 2016, he reported that the SI joint injection improved his low back pain but that he still had persistent left hip pain. (Tr. 1264). He reported occasional weakness in his legs. (Id.) Physical examination again revealed left SI joint pain and tenderness in the left paraspinal regions but intact strength and normal gait. (Tr. 1266). Kendricks agreed to undergo a left SI joint fusion. (Tr. 1267).

Kendricks sought a second opinion with orthopedist Dr. Richard Davis in November 2016. He reported previous physical therapy and injections which did not significantly help his pain and stated the pain in his left SI joint is worse with sitting or leaning forward. (Tr. 1856). An examination revealed a normal, reciprocal, non-antalgic gait without an assistive device, full strength in bilateral lower extremities and good heel/toe walking, but tenderness in the SI joint. (Tr. 1858-59). Another left SI joint injection was administered. (Tr. 1859). He followed up with Dr. Davis in December 2016, stating the injection helped "a little bit" but reporting pain of 4/10. (Tr. 1875). His gait was reported as normal and non-antalgic, with normal sensation

and coordination. (Id.) A lidocaine injection was administered to his left trochanteric bursa. (Tr. 1876). Kendricks saw Dr. Davis again in February of 2017 complaining of left shoulder pain and weakness exacerbated by activity and overhead movements. (Tr. 1904). His gait was again noted as normal. (Id.) Dr. Davis noted a prior right rotator cuff surgery and suggested partial terrain in his rotator cuff. (Tr. 1907). Kendricks was not interested in an injection or physical therapy but requested an MRI. (Id.) The MRI showed mild tendinopathy and bursal fraying but no large rotator cuff tear. (Tr. 1917, 1924). At a follow-up, his pain level was 1-2/10. (Tr. 1924). He underwent another left SI joint injection in March 2017 and July 2017 and a left subacromial bursa injection in August 2017. (Tr. 1928, 2156, 2182).

Throughout 2017 he reported to his chiropractor recurring pain, with some relief from treatment, but noting pain was present 25-50% of the time aggravated by bending, pushing, pulling, and reaching. (Tr. 2204-2248). In October 2017 he stated that he fell in a parking lot causing back spasms and discomfort in his right low back. (Tr. 2241). He described his pain as 8/10, present 75-100% of the time. (Id.) By December 2017 he noted his low back pain had improved but still reported pain at 5/10. (Tr. 2247). Throughout 2018 his chiropractor noted his daily activities were moderately affected by his condition, in that he had marked difficulty and required

frequent breaks and modifications of tasks. (Tr. 2254-2280). He noted having a caudal epidural injection in May 2018. (Tr. 2264).

Kendricks began seeing a new pain management specialist, Dr. Jin Han, in September 2017. At an initial appointment he noted SIJ injections provided only about 4-6 weeks of pain relief, with the left trochanteric injections providing longer relief, but desired to limit the amount of steroid since he gets anxious and agitated following the injections. (Tr. 2502). He reported pain around the left low back, buttock, and lateral hip with intermittent mid-posterior thigh and groin region. (Id.) He rated his pain as 7/10 and constant in nature. (Tr. 2510). Dr. Jin Han noted that Kendricks remained relatively active but did not perform regular stretching and exercises at home. (Id.) He described his gait as intact and 4/5 strength in hamstrings but otherwise symmetrical bilaterally but noted tenderness in the left SI region and mild left trochanteric tenderness. (Tr. 2503). It was recommended he continue with his current medications and trial left lumbar facet injection and consider caudal epidural steroid injection later on. (Id.) He underwent a left lumbar facet injection in October 2017 and January 2018. (Tr. 2522, 2577). He underwent caudal epidural steroid injections in May and July 2018 and June 2019. (Tr. 2621, 2678, 2727).

An August 2019 MRI revealed multilevel, multifactorial degenerative changes of the lumbar spine with varying degrees of spinal canal and neural

foraminal stenosis and STIR hyperintensity within the left L4-L5 facets. (Tr. 2421). He visited a neurosurgery clinic again in February 2020 for progressive increase in pain radiating from his left buttock, hip, and down the left leg in a lateral distribution stopping at the knee with left knee pain. (Tr. 2777). He reported weakness, numbness, and tingling in his left leg and toes. (Tr. 2777-78). An examination revealed grossly full strength in bilateral upper and lower extremities and intact sensation. (Tr. 2780). The neurologist noted that the imaging did not explain the symptoms but suspected bursitis and peripheral neuropathy. (Tr. 2781). At a pain management phone follow-up in June 2020, it was noted that one of the caudal epidural steroid injections provided him with good relief but minimal with others and that he had pain in his left low back and buttock with radiation down his left anterolateral and lateral leg to the knee. (Tr. 3016). He also reported a "cold sensation" in his left foot. (Id.) He returned to pain management in July 2020 for another epidural steroid injection in his spine. (Tr. 3029-30). The pre-procedure note states: "After exhausting conservative measures including but not limited to stretching/strengthening of the affective area, and medication management . . . it was determined that the patient was appropriate to be treated in urgent manner to alleviate pain and suffering." (Tr. 3029). In August 2020, he reported that initially the epidural steroid injections worked well to relieve his pain but that the last two treatments had

not been effective. (Tr. 3115). He stated he still remained relatively active. (Id.) He reported constant 7/10 pain in his low back. (Tr. 3116). It was recommended he re-evaluate with spine surgeons. (Id.)

### 2. *The Medical Opinion Evidence*

In addition to the medical records showing Kendricks suffered from chronic back and hip pain for which he sought extensive and consistent treatment from a variety of medical specialists, the record also contains medical opinion evidence from one non-examining impartial medical expert, who opined that Kendricks was capable of medium work, and statements from four different treating providers that all indicate Kendricks was not capable of consistent employment.

On July 29, 2017, non-examining medical expert Dr. Robert Sklaroff reviewed Kendricks' existing medical records and opined as to his ability to perform work-related activity. Dr. Sklaroff opined that Kendricks could continuously lift and carry up to twenty pounds and frequently up to fifty pounds, could sit, stand, and walk for three hours at a time and six hours total in an eight-hour workday, did not need a cane to ambulate, and could continuously reach, handle, finger, feel, push/pull, and operate foot controls. (Tr 2001-03). Dr. Sklaroff found that Kendricks could never climb ladders or scaffolds but could continuously climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. (Tr. 2004). With the exception of

never being exposed to unprotected heights, he opined that Kendricks had no environmental limitations. (Tr. 2005). Curiously, when asked to identify the particular medical or clinical findings which supported his assessment of Kendricks' physical postural abilities, Dr. Sklaroff simply noted, "anxiety." (Tr. 2004, 2005). Dr. Sklaroff also appeared at a prior administrative hearing and testified consistent with this opinion. (Tr. 113).

Kendricks' treating sports medicine physician, Dr. Richard Davis, also completed an RFC assessment of Kendricks on August 23, 2017, and came to a vastly different conclusion regarding Kendricks' functional abilities. Dr. Davis stated that he had treated Kendricks once every three months for one to two years for his shoulder impingement, SI joint dysfunction, and hip bursitis. (Tr. 2008). Dr. Davis opined that Kendricks would be off-task more than 25% of a typical workday and would be absent four or more days of work per month due to his impairments. (Id.) Dr. Davis further opined that Kendricks could frequently lift and carry less than ten pounds, could occasionally lift and carry ten pounds, and could rarely lift and carry twenty pounds. (Tr. 2009). He opined that he could sit and stand for two hours total and walk for one hour in an eight-hour workday. (Id.) According to Dr. Davis, Kendricks did require a cane to ambulate and could only walk about twenty-five yards without one. (Id.) Dr. Davis further opined that Kendricks could rarely reach,

16

handle, finger, feel, or push/pull with his left arm, but could frequently perform those activities with his right arm. (Tr. 2010). He also opined that Kendricks could frequently use foot controls with both feet, could frequently rotate his head and neck, and could occasionally climb stairs and ramps and balance, but could never stoop, kneel, crouch, or crawl. (Id.)

Kendricks' primary care provider, Kristen O'Donnell, CRNP, DNP,[3] also provided a treating source opinion on September 28, 2017. Dr. O'Donnell noted that she had treated Kendricks every three to four months since July 2012. (Tr. 2018). Like Dr. Davis, Dr. O'Donnell opined that Kendricks would be off-task more than 25% of a typical workday due to his impairments and would be absent from work three days per month. (Id.) O'Donnell opined that Kendricks could frequently lift and carry up to twenty pounds and could rarely lift and carry fifty pounds due to his shoulder impingement and SI joint dysfunction. (Tr. 2019). She further opined that Kendricks could sit, stand, and walk for four hours total in an eight-hour workday. (Id.) According to Dr. O'Donnell, Kendricks could rarely reach with both extremities, but could occasionally handle, finger, feel, and push/pull; he could frequently use foot controls with both feet; could occasionally climb stairs and ramps

---

[3] Dr. O'Donnell is a Doctor of Nursing Practice (DNP) and referred to herself as Dr. O'Donnell in her treating source statement.

and balance but never climb ladders and scaffolds, stoop, kneel, crouch, or crawl. (Tr. 2020). The ALJ also considered a note from Dr. O'Donnell, issued on the same day, which notes he occasionally needs to use a cane when walking, especially when he suffers from muscle spasms, despite her treating source statement that indicating he needed no assistive device, and that he needs to take multiple breaks when sitting, standing, or walking and must lay down to rest several times in a day to alleviate pain. (Tr. 2023).

Kendricks' treating chiropractor, Jason Burgess, also completed a treating source statement on May 5, 2017. Like Kendricks' other treating sources, Burgess opined that Kendricks retained some postural abilities despite his impairments, but that he would be precluded from the workforce due to time off-task and absenteeism. Like Dr. Davis and Dr. O'Donnell, Burgess opined that Kendricks would be off-task more than 25% of a typical workday and would likely be absent four or more days per month due to his impairments. (Tr. 1236). He also opined that Kendricks could occasionally lift ten pounds and rarely lift twenty pounds; could sit for four hours and stand and walk for one hour in an eight-hour workday; could occasionally reach and frequently handle, finger, feel, and push/pull; could occasionally use foot controls; and could occasionally climb stairs and ramps but rarely climb ladders and

18

scaffolds, balance, stoop, kneel, crouch, or crawl.. (Tr. 1237-38). Burgess noted that Kendricks did use a cane or assistive device for back support. (Tr. 1237).

The record also contains an opinion from Kendricks' treating physical therapist, Dr. Frank Seratch. Dr. Seratch's opinion forms part of the basis of this appeal, since it was submitted on January 28, 2021, after the ALJ's opinion was rendered, and the Appeals Council did not consider it, explaining Kendricks had not shown a reasonable probability that it would have changed the outcome of the decision. (Tr. 3). For his part, Dr. Seratch noted treating Kendricks for 33 physical therapy visits between August of 2015 and January of 2016. (Tr. 29). In Dr. Seratch's opinion, Kendricks was only capable of performing sedentary work. (Id.) Similarly to Dr. Davis, Dr. Seratch opined that Kendricks could sit, stand, and walk for two hours in an eight-hour workday. (Tr. 25). He opined that Kendricks could drive to/from work, could occasionally lift/carry fifteen pounds and could frequently lift/carry ten pounds, and could use his right foot for foot controls, but not his left foot. (Tr. 26). Dr. Seratch further opined that Kendricks could occasionally bend and squat but could never kneel, crawl, or climb stairs or ladders; that he could occasionally grip and grasp with both hands and occasionally reach with both hands and push/pull with his left arm but never push/pull with his right arm. (Tr. 27).

19

Thus, every physician and specialist who examined and treated Kendricks opined that he would at least be limited to sedentary work, he would have limitations in his ability to sit and stand for a full workday, and that his chronic pain would result in frequent absenteeism and off-task time. This consensus of treating sources was contrasted against a single, non-examining consultant's opinion that Kendricks was capable of medium exertion work with few postural limitations, supported only by a single reference to Kendricks' "anxiety."

### 3. The ALJ Decision

It was against this clinical backdrop that an ALJ conducted a third hearing regarding Kendricks' disability application on August 4, 2020.[4] (Tr. 128-178). Kendricks and a vocational expert both appeared and testified. (Id.) In his testimony, Kendricks stated that since his December 2013 fall, he cannot work due to pain. (Tr. 138). Specifically, he testified that he cannot stand or sit for long due to intense numbness, weakness, and tingling in his leg and pain in his back and hips, that he could lift about ten pounds, and that he had been using a cane to ambulate for the past two years. (Tr. 138-40). He reported pain and "cold feeling" in his left leg (Tr.

---

[4] An ALJ initially denied Kendricks' application for benefits on March 30, 2018, after conducting two hearings at which Kendricks and medical expert Dr. Sklaroff appeared and testified. (Tr. 316-37). That decision was remanded by the Appeals Council and Kendricks' case assigned to a different ALJ. (Tr. 338-41).

140). As for his activities of daily living, he reported living with his parents, cooking a meal once a week, driving short distances about once a week, and grocery shopping. (Tr. 137, 142-43). He reported increased back pain over the prior three years with new left leg weakness and pain that affected his ability to shower and use stairs. (Tr. 146-47).

Following this hearing on October 9, 2020, the ALJ issued a partially favorable decision on Kendricks' application for benefits. (Doc. 98-117). In that decision, the ALJ first concluded that Kendricks satisfied the insured status requirements of the Act through March 31, 2018. (Tr. 106). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Kendricks suffered from the following severe impairments: spinal disorders, including lumbar degenerative disc disease and spondylosis, left hip disorder including trochanteric bursitis, history of a left knee surgery, right shoulder disorder status-post rotator cuff surgery, and obesity. (Id.) At Step 3 the ALJ determined that Kendricks did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 108).

The ALJ then fashioned an RFC that contradicted and rejected the treating and examining source opinions, finding that, since December 7, 2013, Kendricks:

> Ha[d] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with additional limitations. The

21

claimant is limited to occupations that require no more than occasional postural maneuvers, such as balancing, stooping, kneeling, crawling, crouching, and climbing on ramps and stairs. He must avoid occupations that require climbing on ladders ropes and scaffolds. He is limited to occupations that require no more than occasional pushing and pulling or overhead reaching with the upper right extremity and no more than occasional pushing and pulling with the lower left extremity. He must avoid frequent concentrated exposure to environments with temperature extremes,  excessive vibration, extreme dampness and humidity. He is limited to occupations, which do not require frequent exposure to dangerous machinery and unprotected heights.

(Tr. 108-09).

 In reaching this conclusion, the ALJ gave little weight to the treating source statements of Dr. Davis, Dr. O'Donnell, and Jason Burgess. As to the opinion of Dr. Davis, the ALJ gave this opinion little weight because it lacked factual support and was inconsistent with the longitudinal medical record, noting objective examination findings of normal strength, sensation, reflexes, and coordination in the extremities and normal gait. (Tr. 114). The ALJ also rejected the opinions of Dr. O'Donnell and chiropractor Jason Burgess, noting that they were "non-acceptable" sources but nonetheless briefly addressing them and again noting that the limitations expressed in these opinions were inconsistent with the objective examination findings of normal neurological and musculoskeletal functioning. (Id.)

Instead, the ALJ gave partial weight to the opinion of non-examining medical expert Dr. Sklaroff, noting only that his opinions were supported by "his professional

expertise, his review of the medical evidence, and his well-reasoned explanations."
(Tr. 113). Nonetheless, the ALJ also noted that Dr. Sklaroff's opinion was
inconsistent with subsequent medical records showing Kendricks' generally
progressing lower back and lower extremity pain in the last two years and
corroborating objective evidence including an August 2019 lumbar spine MRI
indicating progressive degenerative disc disease and August 2020 EMG testing
confirming some lumbar spine radiculopathy. (Id.)

The ALJ also considered Kendricks' testimony and a third-party statement
from his mother but found that his reports of debilitating pain were inconsistent with
the longitudinal medical record, stating:

> Considering the longitudinal medical record as a whole, the
> undersigned finds that the claimant's disability allegations are generally
> inconsistent with the record evidence. Despite documentation of the
> aforementioned physical impairments, he repeatedly exhibited normal
> neurological functioning in all extremities and on multiple occasions,
> along with a normal unassisted gait. Relatedly, there is no corroborating
> evidence of the need to use, or actual use of an assistive device. In
> addition, in relation to the claimant's lumbar spine and left hip
> impairments, imaging evidence was overall unremarkable and he was
> recently assessed with generally mild lower extremity radiculopathy.
> Further, the claimant's reports of chronic and debilitating pain are not
> completely supported by the longitudinal medical record and relatively
> conservative treatment history. Indeed, in September 2019, the
> claimant reported use of ibuprofen to treat his pain and he was not even
> taking the medication daily. Further, as discussed above, the reports of
> activities of daily living in his function report and in treatment notes
> does not completely corroborate his allegations, as presented in
> testimony at the hearings. In sum, the longitudinal medical record is

> inconsistent with the claimant's allegations of an extreme loss of physical capacity (i.e., a virtual inability to perform postural maneuvers, only being able to lift and carry less than ten pounds, and only being able to stand and for fifteen minutes).

(Tr. 112-13).

Having rejected the treating source medical opinions that were largely consistent with Kendricks' subjective complaints regarding his debilitating back pain for which he sought treatment with multiple specialists in favor of less restrictive manipulative limitations that appear to be based on the ALJ's own subjective assessment of Kendricks' medical records, the ALJ crafted this residual functional capacity assessment for Kendricks based largely upon this lay evaluation of the medical evidence, in a manner that contradicted the great weight of his treating source opinions, stating that the record as a whole did not support any greater limitations than those outlined in the RFC. (109-15).

The ALJ then found that Kendricks could not perform his past work as a cable installer helper but found at Step 5 that, prior to June 7, 2019, when he changed age categories, he could perform work available in the national economy. (Tr. 115-16). The ALJ then found that, beginning on June 7, 2019, the date Kendricks' age category changed, there are no jobs that exist in significant numbers in the national economy that he could perform and he became disabled on that date. (Tr. 116-17).

24

This appeal followed. (Doc. 1). On appeal, Kendricks challenges the adequacy of the ALJ's evaluation of the treating source opinions, rejecting the statements of all of Kendricks' treating providers, which were consistent with his subjective complaints, and giving partial weight to a non-treating source opinion that was based on an incomplete record.

As discussed below, we conclude that the ALJ did not properly evaluate the opinions of Kendricks' treating sources in compliance with the regulations that were in effect at the time of Kendricks' application. Specifically, the ALJ failed to adequately articulate his reasoning for wholly rejecting the great weight of treating source opinion evidence in favor of an RFC which gave partial weight to an outlier, non-treating source opinion, and was largely based upon the ALJ's lay interpretation of the evidence. Since the burden of articulation has not been met in this appeal, we will order that the decision of the Commissioner be reversed in this case, and that this case be remanded for further proceedings.

## III.    <u>Discussion</u>

### A.    <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the

record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency

factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. <u>See Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford</u>, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.    <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).  To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be

set aside if it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also</u> <u>Metzger v. Berryhill,</u> No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

31

opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller, 962 F.Supp.2d at 778–79 (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here,  where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In

this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d

33

Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate

which evidence was accepted, which evidence was rejected, and the reasons for

rejecting certain evidence.  Id. at 706-707.  In addition, "[t]he ALJ must indicate in

his decision which evidence he has rejected and which he is relying on as the basis

for his finding."  Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir.

1999).

### C.    Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The Commissioner's regulations in effect at the time of this claim also set

standards for the evaluation of medical evidence and defined medical opinions as

"statements from physicians and psychologists or other acceptable medical sources

that reflect judgments about the nature and severity of [a claimant's] impairment(s),

including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can

still do despite impairments(s), and [a claimant's] physical or mental restrictions."

20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate

every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to afford competing medical opinions and evidence,

the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations

provide progressively more rigorous tests for weighing opinions as the ties between

the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL

374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. <u>See</u> 20 C.F.R. §404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); <u>see also</u> SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These

benchmarks, which emphasize consideration of the nature of the treating relationship, also call for careful consideration of treating source opinions.

Indeed, this court has often addressed the weight which should be afforded to a treating source opinion in a Social Security disability appeals and emphasized the importance of such opinions for informed decision-making in this field. Recently, we aptly summarized the controlling legal benchmarks in this area in the following terms:

> Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 CFR § 404.1527(c)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Oftentimes referred to as the "treating physician rule", this principle is codified at 20 CFR 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794 F.2d 896 (3d Cir. 1986). The regulations also address the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 CFR § 404.1527(c)(2). "A cardinal principle guiding disability, eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); See also Brownawell v. Commissioner of Social Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence

36

and not due to his or her own credibility judgments, speculation, or lay opinion." <u>Morales v. Apfel</u>, supra at 317.

<u>Morder v. Colvin</u>, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24, 2016).

Thus, an ALJ may not unilaterally reject a treating source's opinion and substitute the judge's own lay judgment for that medical opinion. Instead, the ALJ typically may only discount such an opinion when it conflicts with other objective tests or examination results. <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion and the doctor's actual treatment notes justifies giving a treating source opinion little weight in a disability analysis. <u>Torres v. Barnhart</u>, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." <u>Tilton v. Colvin</u>, 184 F.Supp.3d 135, 145 (M.D. Pa. 2016). However, in all instances in social security disability cases the ALJ's decision, including any ALJ judgments on the weight to be given to treating source opinions, must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter</u>, 642 F.2d at 704. Indeed, this principle applies with particular force

to the opinion of a treating physician. <u>See</u> 20 C.F.R. §404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999) (quoting <u>Mason</u>, 994 F.2d at 1066)); <u>see also</u> <u>Morales</u>, 225 F.3d at 317. Therefore, the failure on the part of an ALJ to fully articulate a rationale for rejecting the opinion of a treating source may compel a remand for further development and analysis of the record.

### D.    <u>The ALJ's Opinion is Not Supported by Substantial Evidence.</u>

This case presents a striking circumstance. In fashioning an RFC for the plaintiff and denying this disability claim, the ALJ rejected three contemporaneous and consistent opinions by treating sources of varying specialties and instead fashioned an RFC that was based on the temporally remote response to interrogatories and prior hearing testimony of a non-examining physician and the ALJ's own lay assessment of Kendricks' medical records. In our view, the ALJ's justification for this course of action, citing only to his impressions regarding the significance of examination findings showing normal gait, strength, and sensation, but disregarding and, at times misrepresenting, the plaintiff's consistent complaints

38

of debilitating pain, supported both by the medical record and the treating source

opinions, is insufficient to justify discounting the medical opinions of these treating

and examining sources, particularly where these limitations, if credited, would have

precluded Kendricks from performing work-related activities. Therefore, we find

that substantial evidence does not support the ALJ's decision in this case.

Specifically, this RFC determination runs afoul of the long-standing treating

physician rule which applies in this case. As we have observed:

> Under applicable regulations and the law of the Third Circuit, a treating
> medical source's opinions are generally entitled to controlling weight,
> or at least substantial weight. See, e.g., Fargnoli v. Massanari, 247 F.3d
> 34, 43 (3d Cir. 2001) (citing 20 CFR § 404.1527(c)(2); Cotter v. Harris,
> 642 F.2d 700, 704 (3d Cir. 1981)). Oftentimes referred to as the
> "treating physician rule", this principle is codified at 20 CFR
> 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v.
> Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794
> F.2d 896 (3d Cir. 1986). The regulations also address the weight to be
> given a treating source's opinion: "If we find that a treating source's
> opinion on the issue(s) of the nature and severity of your impairment(s)
> is well supported by medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent with the other substantial
> evidence in your case, we will give it controlling weight." 20 CFR §
> 404.1527(c)(2). "A cardinal principle guiding disability, eligibility
> determinations is that the ALJ accord treating physicians' reports great
> weight, especially when their opinions reflect expert judgment based
> on continuing observation of the patient's condition over a prolonged
> period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)
> (citations omitted); See also Brownawell v. Commissioner of Social
> Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the
> treating physician's assessment, an ALJ may not make "speculative
> inferences from medical reports and may reject a treating physician's
> opinion outright only on the basis of contradictory medical evidence

and not due to his or her own credibility judgments, speculation, or lay opinion." <u>Morales v. Apfel</u>, supra at 317.

<u>Morder v. Colvin</u>, 216 F.Supp.3d 516, 528 (M.D. Pa. 2016). Moreover, where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These benchmarks, which emphasize consideration of the nature of the treating relationship, also call for careful consideration of treating source opinions.

In this case, we find that the ALJ's decision denying Kendricks' application violated the treating physician rule when the ALJ gave little weight to the three treating source opinions without an adequate explanation.[5] Broadly speaking, the

---

[5] It is also worth noting that the cursory manner in which the ALJ evaluated the opinions of CRNP Kristin O'Donnell and chiropractor Jason Burgess is also worth revisiting on remand. The ALJ notes that these are opinions from "non-acceptable sources" and addresses both opinions in a single paragraph, citing only to the

ALJ simply addressed none of the relevant factors that the regulations at the time required him to consider. Instead, the ALJ improperly rejected the consistent opinions of three of Kendricks' treating physicians, citing to repeated references in the record of normal neurological functioning with intact motor strength, sensation, reflexes, coordination, and normal gait. The ALJ then fashioned an RFC that was unsupported by any medical opinion, finding Kendricks was capable of light work, when the non-treating medical opinion to which he gave partial weight found he could do medium exertion work and all of his treating sources found he would be limited to, at most, sedentary work and would likely be unable to meet the attendance demands of a daily work schedule.

The ALJ based this entire analysis upon his interpretation of the examination findings in the record, which we acknowledge consistently demonstrated normal gait, strength, and sensation, but wholly ignored the main factor in Kendricks'

---

explanation provided in rejecting the opinion of Dr. Davis. Despite the ALJ's view that these are not acceptable sources, pursuant to SSR 06–3p, ALJs are required to evaluate medical opinions from non-acceptable sources using the same rubric as acceptable medical sources. See Puterbaugh v. Colvin, No. 1:14-CV-1134, 2015 WL 4730068, at *10 (M.D. Pa. Aug. 10, 2015). Although the ALJ did mention these opinions, we are skeptical of the thin analysis provided, especially considering the longstanding treatment history between the plaintiff and his primary care provider Dr. O'Donnell, whose opinion "reflect[s] expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).

disability, his constant, debilitating back and hip pain. On this score, we note that the postural limitations opined by the treating sources were not entirely inconsistent with the normal examination findings of strength, sensation, and gait. Indeed, each of the physicians opined that Kendricks retained some ability to perform postural activities such as lifting and carrying ten pounds, using foot controls, climbing stairs and ramps, and balancing, and standing and walking for short periods, but rather what would significantly limit the plaintiff in his ability to perform work-related activities would be his absenteeism and off-task time, which would be supported by his consistent and well-documented complaints of pain and muscle spasms, which the ALJ wholly ignored in his analysis. In fact, Kendricks' medical records document frequent, consistent complaints of debilitating pain and significant functional limitations due to his injuries following the 2013 fall. Despite extensive treatment efforts—including physical therapy, joint injections, chiropractic care, and pain medications—his pain persisted at varying levels of severity, requiring continuous medical management. He sought care regularly from specialists and reported limited relief, with multiple interventions noted to provide only temporary improvement. Moreover, despite the ALJ's characterization that "examiners repeatedly observed the claimant as being in no apparent distress without objective signs of overt pain behavior," (Tr. 112), physical examinations consistently revealed pain and

tenderness in his back and hip with palpation, (Tr. 795-96, 800, 1266, 2014, 2503), and reports of pain at 5/10 or higher. (Tr. 788, 798, 1697, 2013, 2241, 2247, 2510, 3116). Thus, the neurological examination findings which completely disregard Kendricks' pain, simply do not tell the full story. And, in our view, given the great deference owed to treating source opinions, and the consistency and weight of the treating source opinions in this case – including four treating sources who consistently opined that Kendricks would simply be unable to perform the postural requirements of the articulated RFC, more explanation and support was needed on the part of the ALJ to wholly reject all of the treating medical source opinion evidence.[6]

Furthermore, while the ALJ indicated he gave partial weight to the non-treating opinion of Dr. Sklaroff, he also found his much less conservative limitations, indicating Kendricks was capable of medium exertion work, inconsistent with more

---

[6] Since we find the ALJ erred in his assessment of the treating source opinions that were available to him at the time of the decision, we need not reach the issue of whether the Appeals Council improperly rejected the medical opinion of treating physical therapist Mr. Seratch. We do simply note that Mr. Seratch's opinion, which is consistent with the limitations opined by Kendricks' other treating providers, lends them further credence. Moreover, with regard to the Appeals Council's opinion that the evidence did not show a reasonable probability that it would change the outcome of the decision, adopting this point of view, it would not matter how many treating source opinions determined the claimant could not work, the ALJ still would not find them persuasive.

recent medical records including an August 2019 lumbar spine MRI indicating progressive degenerative disc disease and August 2020 EMG testing confirming some lumbar spine radiculopathy, objective testing that the ALJ used only to partially reject the opinion of Dr. Sklaroff, but conveniently omitted in rejecting the opinions of his treating sources. Indeed, the record does now include a more recent opinion, rendered after the acknowledged progressive deterioration of the plaintiff's condition, that supports the findings of the other treating sources. In our view, the ALJ's rejection of all treating source opinions in favor of his own interpretation of the medical evidence ran afoul of the rule that in fashioning a residual functional capacity assessment for a claimant an ALJ may not unilaterally reject all medical opinions in favor of the ALJ's own subjective impressions. See Durden v. Colvin, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

Given the regulations governing evaluation of medical opinion evidence at the time of this disability application, more is needed by way of an explanation. Since the ALJ's burden of articulation is not met in the instant case, this matter must be remanded for further consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this

evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.    <u>**Conclusion**</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge


Dated: November 27, 2024